Good afternoon and may it please the court. I'm Jeremy Lowry. I represent Mark Morris. This is an appeal of a summary judgment out of the Western District of Arkansas. The case begins with Mr. Morris' incarceration in the Benton County Detention Center. Shortly after he was incarcerated, he was diagnosed with, and I'm going to try and say this, Epididymitis. And this case stems from the treatment of that ailment and primarily focuses on a treatment period between July and the 1st of November of 2013. From April until that time frame, Mr. Morris was treated with antibiotics and was seen by a doctor on at least a couple of occasions. In either July or August of 2013, there's some debate, but at least by August 7th, it was determined that Mr. Morris required surgery for this ailment. He was in significant pain according to his testimony and according to the kiosk statements that he made filed with the nursing staff at the detention facility. This surgery was finally conducted at the end of October. So the termination was made by Dr. Hewitt, right? Yes, Your Honor. An outside doctor. That is correct, Your Honor. The one Morris had been referred by, I assume, the prison medical staff. Yes, Your Honor. The nurse, and that's Darla Watson, who is one of the defendants in this proceeding, had brought Mr. Hewitt in to treat Mr. Morris. He had treated him, I can't give the court a number of times, but he had treated him previously for this ailment across that time period. In August, however, he determined that surgery was going to be necessary to correct the problem. That's where the focal point of this litigation takes place because Dr. Hewitt said, we'll conduct surgery within the next couple of weeks. Mr. Morris was in significant pain and the surgery was ultimately conducted by a different doctor at the end of October. But Hewitt, he was referred to Hewitt within days or at least a couple of weeks after he arrived at the center, right? Yes, Your Honor. It's not like Nurse Watson was his treating medical person for a long period of time. She got him to Hewitt right away. She got him to Hewitt right away, but she was still his primary contact. The problem in this case stems from her communications with Hewitt about providing the surgery that Hewitt determined was necessary. In other words, what... What's the specific problem that you think gives rise to an eighth amendment? The specific problem is that we believe the record shows that Dr. Hewitt determined that surgery was necessary and that there were financial problems between Dr. Hewitt and the prison that were facilitated by Nurse Watson that delayed that surgery. What was the facilitated or caused? What? Your Honor, Nurse Watson and the only... Let me go back and explain the prison history if I may, Your Honor. There is a problem, at least in the record, under which Nurse Watson had a prior history of delaying or not requesting scheduled procedures based on financial basis. A, what's that based on and B, what difference does it make? Your Honor, in this particular situation, if we look at the kiosk, and by kiosk I mean the prison reporting her communications with the inmate and the inmate's communications with her, there are indications across this period that Dr. Hewitt's office says, we don't think we're going to get paid. What dates? Pardon? What dates are we talking about? We're talking... We're talking about Morris. You were wandering off into some prior other inmate experiences? I don't know. Your Honor, we're talking about specifically with regard to Mr. Morris in August and September of 2013. Oh, okay. But she's gotten him to Hewitt almost immediately upon his arrival at the center. Correct. Hewitt treats him from May till maybe early August and says that the meds are not working. I think he needs surgery and he's done some other diagnosis, obviously. And as I understand, he then schedules the surgery within a week or two. He does not schedule the surgery. Well, he says it's needed. It should happen within a week or two. Yes, Your Honor. That's correct. He's the only one in charge of scheduling, right? He does the scheduling. We would not... We would contend that that is not the case, Your Honor. Based on what facts in the record? Based on Ms. Watson's testimony in her statement. There's actually a hearing statement in this which makes it a little bit unusual. Very unusual. I'm not sure I've ever seen that before. There is a hearing before summary judgment, actually before counsel is appointed for Mr. Morris at which Nurse Watson testifies. And she testifies to attempts to schedule a surgery for Mr. Morris. But we have... Our contention is that there are credibility issues with that testimony, first of all. That's an interesting thing because as I was looking at that, it seemed to me that we have her testimony about repeated efforts to try and schedule it. And then your client's testimony. But there doesn't seem to be anybody saying, you know, there's an absence of documentary proof. And that's the thing you're pointing at, right? Yes, Your Honor. That is the problem. Well, yes. But what evidence do you have? Is there any actual evidence that would suggest that Nurse Watson's testimony is false? Well, Your Honor, first of all, in her testimony itself, she talks about these dialogues that she has with Mr. Morris. And at one point in that testimony, she says, well, I misrepresented to Mr. Morris what was going on with Dr. Hewitt because I was afraid he might get upset. This is when the court is directly questioning her in that testimony. The second issue is that she contends that she wrote a letter and made phone calls to Dr. Hewitt. First, there was a letter that she obtained from the captain that said, we will pay for this surgical procedure. That is not in the record. The phone calls are not noted in the nurse's logs. And so our position would be that her... What affirmative evidence is it? So your position is she's lying and basing her... Yes, Your Honor. Yeah, that would be it. To the jury, you would argue she made it all up to... Yeah, and we would argue that this is a credibility determination for her. But she came to free summary judgment, much less qualified immunity, by just saying, well, the jury might not believe that person. With regard to that... There's countless cases to that effect. The response that I would have with regard to that, Your Honor, though, is that there is an affirmative delay, and that her explanation of that delay... What affirmative evidence is there that she was responsible for scheduling Hewitt's surgeries? Well, she indicated that she was responsible, I believe, Your Honor, and I don't have a quote on this one, that she was the person in the prison who would communicate with Dr. Hewitt's office. But that's not... Prison staff don't schedule an outside doctor's medical appointments. Dr. Hewitt schedules Dr. Hewitt's surgeries. And in the notes, in her responses to Mr. Morris through the kiosk determination, she says to Mr. Morris, there are concerns about payment. At one point, Mr. Morris actually states, I don't have money to pay for this, which means that this isn't necessarily a scheduling problem, this is a payment problem. But what's her fault for that? Why would she be at fault if there were payment issues? I don't know what you mean by payment issues between Hewitt and, I guess, the prison. That is the implication, is that Dr. Hewitt believes he's not going to be paid if he conducts a surgery based on her communications with Mr. Morris. And was she responsible for the payment or arranging the payment? Well, Your Honor, we would believe that she would, we would say she would be responsible for communicating with somebody about arranging for the payment if that's the problem that was communicated to her. Are you saying responsible to communicating to Morris, to her... To the sheriff. To the sheriff? Yes, Your Honor. Or to the doctor? To the sheriff, Your Honor. And she says she did that by getting the captain to send the letter and you question the credibility of it. And we do question that because the letter is not in this nursing record, which is otherwise... So your theory is the doctor expressed concern about payment and she just did nothing about it? Your Honor, there's no record of the phone calls she testified to, there's no record of the letter that she... No, I got that. I'm just trying to understand where that... I understand where the position of having to prove somewhat of a negative... Well, is that what you're trying to prove? That she knew there was a payment issue and just ignored it and did nothing and didn't take any steps to try to get it resolved? Is that the argument? I'm trying to understand the theory of the constitutional violation. The theory... If you get all the facts that you want, what's the legal theory? The legal theory, Your Honor, is that Mr. Morris has a right to medical treatment. He had a serious medical problem and there's no contention that there was not a necessity, there was not necessary medical procedure that needed to be done here. There is a significant delay and our theory is that one, that delay was either facilitated by Ms. Watson by failure to communicate with Dr. Hewitt's office and I would point out that when she was questioned specifically on why she said to Mr. Morris that she was not, she said she didn't know, but she admitted that she had done that. And so our... Did she admit that she did not talk to Dr. Hewitt? What she said, Your Honor, I believe was that she informed Mr. Morris she was talking to Dr. Hewitt's office after she had passed the point at which she had any communication with Dr. Hewitt's office. I don't believe she gave a date for that. What about Dr. Hewitt's records? Do they have the captain, the letter from the captain in it? Do they have notes about conversations regarding arrangements for payment? To the best of my knowledge, Dr. Hewitt's records do not contain that letter. I haven't seen the letter, Your Honor. I think he responded to some discovery by saying he didn't have any records about Morris. That is... Which would include records he obviously should have had, like Morris's visits that led to the pain medicine and so forth. So I don't know what that shows. It shows I guess he doesn't have any records. I don't know if it shows anything about the captain's letter. It shows that we don't have a copy from his records is what it would show, Your Honor. What case holds that prison medical staff are liable under deliberate indifference theory for lack of treatment because of an outside doctor's concern over being paid? Your Honor, I will note I'm out of time, but I will try and answer your question. You're not out of time. You've got three minutes. Okay. With regard to Farmer v. Brennan holds that there is an obligation on the part of the prison... These are fact-specific cases. Your Honor... Particularly for qualified immunity. That's why I asked you a very specific, does any case... What's your best factually similar case for medical staff being deliberately indifferent because Hartsfield v. Colburn, there the non-medical reason was the inmate's misbehavior. That's completely different than a nurse being unable to facilitate an outside doctor's scheduling. Your Honor, I would probably point to Holden v. Herner. There is language in that case that talks about dental procedures and it cites additional cases involving dental procedures in which there are three weeks delayed for a dental procedure. That's a delay. Your theory is not... Well, it's delay-based. Within a month or so, less than two months, she's finding a substitute doctor because she can't get Hewitt's office to schedule the surgery that he had said was necessary. That's the opposite of deliberate indifference. That's ongoing care or concern that he be treated. With regard to that, Your Honor, unless I don't know if there's... I don't have any further answer to your question. The case I've cited is the one we would rely on. What was the reason for the delay in the dental case? Was it something to do with payment or something else? I honestly don't know, Your Honor. I don't know what the cause of the delay was. What was the effect of the delay here? I thought there was medical evidence that there was no... That's why we would cite to Holden. Again, there actually is medical evidence because the subsequent doctor who conducted the surgery said that he improved after the surgery was conducted. In fact, I think we've cited to that in our brief where he said there was actual significant improvement. But the delay didn't interfere with that improvement, did it? That improvement would have happened whether the surgery occurred in October or September. I will try and answer this quickly. In that same Holden case, it talks about acute or progressive injury. And we would argue that the acute pain was the cause of the damage here that was exacerbated by the continued delay, Your Honor. And I'm out of time. But he continued to complain of acute pain after the second surgery. Your Honor, may I answer the court's question? With regard to that, the surgeon who conducted the first surgery opined that he improved. And then it became worse again, or at least that's what we believe the record shows, Your Honor. Was the pain improved or the condition improved? Both, Your Honor. But then the pain recurred because he was complaining about serious pain before the second surgery. That's correct, Your Honor. Now, I'm just not seeing what the 30-day delay on the first surgery has to do with that cycle. It seems like that would have happened regardless of when the surgery occurred. With regard to that, Your Honor, what we would contend would be, though, that he had to deal with that pain prior to the first surgery. All right. So your claim is all based on pain before the first surgery. Yes, Your Honor. Well, I wonder if that's enough. I wonder if our cases say that that's enough to make out a claim. But, okay, I understand the theory. Thank you. Thank you, Your Honor. Ms. Davis? Thank you, Your Honors. May it please the Court. I'm Janann Arnold-Thomas, formerly Davis. I've recently changed my name. I'm here today representing the Appalese, former Benton County Sheriff Kelly Craddock, Nurse Darla Watson, and the official capacity defendant, Benton County, Arkansas. As opposing counsel has noted, this really is a claim about deliberate indifference to a medical need, and certainly while we appreciate Mr. Morris's condition was a serious medical condition, a serious medical need, really the focus of the evidence of this case below and on appeal has been the time frame in which he was provided surgery. So the court below, of course, found no constitutional violation, which led to a grant of summary judgment based on qualified immunity for the individual capacity defendants in Appalese and dismissal for the official capacity Appalese as well. The focus of the standard of review and the case here before the court is the well-settled two-part test in the Farmer v. Brennan case. But it's my suggestion to the court that it is that first objective test that leads us not to have to go any further in this particular case. I agree that the Holden case has particular bearing on this matter because that Holden case discusses how that objective test would be satisfied when we're dealing particularly with a delay. And the court has required that when we're dealing with a delay that the plaintiff, in this case the appellant, present verifying medical evidence that that delay had an effect on his ultimate prognosis. So does that mean pain alone is insufficient to make out a claim based on delay? And, Your Honor, I think that it's not, you know, it's a different inquiry than just the pain alone. I think it's required by a doctor to be able to say, here's some objective medical evidence that indicates Well, if it's just pain, what's he going to say? The guy's in continued pain? Unfortunately, pain is subjective. And there's not any objective medical way to prove pain, and it's only going to be based on the historian. In this case, Mr. Morris, in fact, when he That's why I'm asking you, does that mean that you say that pain alone cannot suffice to make out a claim under the Eighth Amendment based on delay? I think that is correct. It's my position, Your Honor, that continued pain, and I think that that's what we see is a recurrence of the pain that Mr. Morris complained about. Actually, on the day of his intake into the Benton County Jail, he described that pain on that day as unbearable. And that pain was, you know, it was treated I know the facts, but so legally you say that cannot I think the Coleman case and ultimately the Briarback case require more. Well, wait a minute. Go ahead. I'm sorry. If that's the case, you could have a guy laying there with a non-displaced fracture of his leg whose every time he moves or she moves at all, she's in like unbelievable pain, which would be somewhat alleviated by casting that leg. And if you just delay for six months to cast it, and the leg heals, right? It heals perfectly, that you would have no claim because pain don't matter? Well, Your Honor, I think the Briarback case actually speaks directly to that. In the Briarback case, the inmate in that case actually had a broken hand. And the claim was on a delay based on the x-rays and the treatment of his broken hand. It was an hour's delay. I believe it was a three-hour delay. Well, somehow three hours strikes me as different than 18 weeks allowing the break to heal. And I do understand. And I think taking it to that level is a different element. Well, this guy is describing debilitating pain for a period of 30 days, right? The same actually or less than he had described for the months before that while he was undergoing regular treatment. So the pain did not change during that period of time. It remained the same as it had before. And ultimately, the surgeon, the second surgeon, opined that the medical evidence, the objective medical evidence that both Dr. Zimmerman, the first surgeon, and Dr. Emory, the second surgeon, saw at the time of surgery didn't indicate that any delay caused a change in his prognosis or had a detrimental effect on his prognosis at all. The only difference is that he was there for a period of weeks after he was told he needed surgery and the pain was ameliorated at least temporarily, right? That's correct. Correct. So, I mean, you know, I just have a hard time believing that it's sort of de minimis that you just get to suffer for a few weeks. And I certainly, you know, in the context of pain, and again, because it's subjective, I certainly don't mean to say that it's de minimis and not something to recognize. And over a period of time, I think it can become more quantifiable. And there may be some evidence. Well, aren't all the dental cases really just about pain? I mean, in this day and age, no one dies any longer from abscessed teeth. Certainly. But I think they could have a condition which was made worse by a delay, just as with a broken limb or finger or anything, which might be made worse by a delay. And in this case, there's just simply no evidence that it was made worse. I can't find a case named Breyerback in your table of authority. And, Your Honor, I'm sorry. Breyerback was actually cited by the Holden case. I've cited the Holden case and, unfortunately, omitted the citations to the authority to that case. I believe that's on page 25 of my brief. And also the Coleman case. Both of those cases relied upon the Holden and Breyerback v. Sears. And that was an Eighth Circuit case? It was, Your Honor. What year? The Breyerback case, I believe, was 1996. Yeah, well, that case says an inmate failed to satisfy the objective component because the inmate failed to submit sufficient evidence the defendants ignored an acute or escalating situation or the delays adversely affected his prognosis. So I suppose 30 days of excruciating pain because of a broken leg might be an acute situation. What about this acute situation? Well, in this situation, again, the only medical evidence, like in the Breyerback case, that was submitted to the court was the affidavit of Mr. Morris' second surgeon that specifically stated that there was no long-term negative effects or that the delay was the cause of his continued pain or ultimately his requiring a second operation. Mr. Morris did not present any evidence to the contrary. So that is the only undisputed evidence before the trial court. You're talking about the evidence against Nurse Watson. Well, because, Your Honor. That's what's tricky in this case. And I understand. You're just trying to say, well, no, he can't win forever and ever. Well, and I'm. All he had was pain. I understand. And it's. You better get off that. Okay. It's my position that if we don't get past that first objective test, that the second part of that test, the subjective test with regard to Nurse Watson, is we don't even get there. But if the court were to find. We're there. If the court were. Going on to the subjective part of the test. And, of course, I think that I would be remiss not to point out that there's been no evidence at all that the other individual capacity defendant below, Sheriff Craddock, had any personal knowledge or. You kind of make it sound like you don't want to talk about Watson. Oh, I do want to talk about Watson. Well, that's what we want to. That's why we're here. Okay. I apologize. That's the tangential. Stop majoring in the minors. Well, with regard to Nurse Watson, you know, the only issue here is. Or the only issue that we've been discussing is her motivation. If there was evidence of a motivation for the delay. But, as I think noted by the court, that's not relevant. Did she block medical treatment for a non-medical reason when her job duties were medical? There is no evidence that she did that. There is no evidence that she blocked it. There are inferences. At least even the Sheriff creates inferences that she might have. I understand, Your Honor. But other than those. Isn't that enough? No, it is not, Your Honor. Why not? Because it must be. According to the standards under summary judgment. The proof that was presented. Her testimony. Must be rebutted with proof. The plaintiff must meet proof with proof on summary judgment. And while certainly. Their claim is the proof is. There is no record. Nurses are ordinarily obligated to keep notes about their conversations. The nursing notes don't show it. If there's correspondence that leaves the jail. Ordinarily there are records of it. There is no evidence of it here. And the absence of a record in the face of a duty to maintain a record. Is in fact evidence that it was not performed. That whatever the action was, was not performed. Now what's your response to that? That the, as the court notes. That if ordinarily those things were not done. But they were not done in this case. That record was not created. That's negligence, Your Honor. Her failing to keep a copy of a letter that. Well, that's not what they're claiming. What they're claiming is. Is that it is objective evidence. Of an intention. To deprive him of medical treatment. To avoid the costs. Right? That's what they're arguing. What they're saying is that she has a practice. And has in the past. Tried to hold off on medical expenses. Moving them to the Department of Corrections. Or wherever this guy is going to end up. On the next place. Rather than on the county jail. And that these records tend to support. That that's what she did in this case. And the sheriff seems to say that. In the past she had in fact done that. Well, actually the testimony was that. On two occasions he believed that she'd done that. But there was no testimony to indicate when that was. True. That's true. And so we're not. There is no record to indicate whether that was after Mr. Morris. Whether it was Mr. Morris. Or maybe it was before. So that. Again, it would require some inference. There is not objective evidence. Why isn't it a reasonable inference? That's what they're arguing. That one could infer from this scenario. That she delayed for financial reasons. Well, and I certainly think that that might be an argument. That would be made to a jury. To make that inference. And to make that credibility decision. To decide that they believe she's lying. But there was no evidence presented. In response to summary judgment. So we do not get to that stage. This is a different level of proof. At this stage. And he has to come forward with more than just the allegations of his pleadings. And more than just. Well, he has come forward with more than just the allegation. He's come forward with the absence of evidence in a record where it ought to be. And claims that that's evidence. And I know you don't want to believe that's evidence. You want to say that's just a mere allegation. But if you just look at the rules of evidence. I mean, there's places where you can admit into evidence. The absence of a record where someone has a duty to maintain the record. Certainly. But I don't think that they've proven that there's a duty to maintain that particular record in this case. And that, of course, would be a fatal flaw. Right? I agree. I agree, Your Honor. Why didn't you put on an affidavit from this Captain Guile. Or put in the letter. A copy of the letter. To the doctor. That would have cleared the whole thing up. Your Honor, I've not been able to locate a copy of the letter. And as the court actually subpoenaed records from Dr. Hewitt. Who provided treatment records. But had no billing file to produce at that point. Which would have indicated that letter. And certainly Captain Guile is available. And would be presented at trial. But it didn't appear to be necessary. Because her testimony was, again, not refuted. By anything other than a suggestion of an inference. That she was not credible. Well, she's not inherent. No witness is inherently credible. Certainly. And if you have some circumstantial evidence to the contrary. We have to decide whether that's enough to make it a jury issue. Certainly. I think the opposite is also true. That the witness is not inherently incredible. And that her testimony does not have to necessarily be bolstered on every point. By other evidence. By the defendant. I certainly think the plaintiff can come forward. And present evidence to the contrary. Which places us in a different position. In response to a motion for summary judgment. But at that point. Aren't you just he said, she said. And isn't that, in fact, a question of fact. That the jury gets to decide. That's correct, Your Honor. And then the case would be not appropriate for summary judgment. And we would then go to a jury. I agree, Your Honor. What about this question. Whether even if she did refuse. Or not refuse. If she did delay in getting the doctor. Because of financial reasons. Is it clearly established that that would violate the 8th Amendment? Only if that delay resulted in a detrimental effect on his prognosis. That's back to your pain argument. But assuming for a minute that the pain itself is enough. Do you know of any cases having to do with an institution delaying treatment. Because of financial considerations. I do not, Your Honor. And in this case, I would suggest that the evidence is to the contrary as well. Even though we agree that there's no letter in the file. Within a short period of time. The surgery was performed. And the second doctor clearly even noted that there was a delay from financial or scheduling reasons. But he did the surgery. The third surgeon said there was no problem from that delay. So I think the motivation is not relevant. The second surgeon noted a delay because of financial reasons? He put it in his notes. That's the way it was reported to him. Why isn't that? Why is a medical staffer responsible for an outside doctor saying, I'm not going to schedule the surgery I think is appropriate. Until I have adequate assurance from the prison that I'll be paid. I do not think. She's a go between. And she keeps telling Morris, don't bother me with this. There's difficulties. They're not her payment difficulties. I agree, Your Honor. I agree. No, Your Honor. Well, why isn't that the focus of the argument? She's got to be deliberately indifferent because she's acting outside of her medical. If she's not acting outside her medical responsibilities, how can she possibly be deliberate indifference under the, that's a reckless negligence standard. I agree, Your Honor. Well, why aren't we talking about that? If you completely ignore it and you don't respond to it, you don't bring it to the sheriff. Say, hey, sheriff, doc says he's not getting paid and the county's got the legal obligation to pay for medical care that's reasonable for inmates who are in our custody. You've got to fix this. I mean, if she does all that, she can't have any liability, right? And I apologize if I didn't follow the court's question, but my understanding of your question is if she goes to the sheriff and reports the fine. If she goes to the sheriff and says, hey, the doctor says we're not getting paid. We've got to work out the payment thing. She's not the bursar for the county. Absolutely. Right? So then the sheriff's the person supposed to be getting this thing figured out. She's done the medical piece, right? Absolutely. I'm trying to get it scheduled, can't get it scheduled because we can't get paid, right? Exactly. It would be a different story, though, if the doctor says, I'm not doing this if I'm going to get paid, and she just, like, went golfing instead. I agree. I absolutely agree, Your Honor. And that's not the case in this case. And that is the real issue here is they're saying that essentially she says she did something, but there's no proof that she did something. In fact, the absence of proof is evidence that she actually did nothing. And you're saying, listen, her testimony is she did something, and that was sufficient. That's correct. She found a second circuit. And she did. That's correct. Within a matter of weeks when she could see that this wasn't being worked out. That's correct, Your Honor. It seems to me that's deliberate concern. I agree, Your Honor. Thank you. Mr. Lowery, do you have some time? His time has expired. I'll give you a couple minutes. We've been wandering around on this thing. Thank you, Your Honor. I want to address just two quick things. With regard to the acute language, we would argue that pain is acute, and that that's the meaning of the word in that context. With regard to the obligation to take action if there was some payment problem, there's a dialogue we haven't talked about in terms of policy in this matter. And we address two policies in this. One of them is the sheriff's policy, which is a written policy, which says that the medical staff is responsible for medical determinations and what's necessary. But not for getting the doctors paid. Not for paying the doctors, no, Your Honor. But we would argue that she would have some responsibility if there was no payment or if the doctors said, I don't get paid, to try and pursue that matter with the sheriff. And then the other policy, which we contend is an unwritten policy, of sifting inmate complaints based on prior problems with inmates. And we've detailed that in our brief, but I just want to put that into the mix in terms of what her obligation was in terms of the written policy from the sheriff's office. And that's all I have. What was the unwritten policy? The unwritten policy, the sheriff testifies that he, and I have this language written down, there were certain measures in place to filter out what was obvious. And when he said obvious, he said some inmates go to the hospital, they say they want to go to the hospital because they want to escape or they want to talk to their girlfriends or something like that. And he said there are certain measures in place to make sure all those complaints don't come to him. Okay. So what case, Eighth Circuit or otherwise, would deny the sheriff qualified immunity because of a policy specifically designed to create unconstitutional non-intervention? Your Honor. In other words, I left it to my subordinates to take care of problems whenever they could. Your Honor, I would start with the- And therefore, when Morris writes the sheriff, he doesn't respond to Morris. Right. With regard to that, Your Honor, I would point to in the Iqbal case, the U.S. Supreme Court Iqbal case, they actually refer to a very old case. And they say that he is responsible for his own neglect and not properly superintending the discharge of his subordinates' duties. In other words, he has an affirmative obligation to assure that care is provided. And we would argue that based on that language, and based on that language which actually is used in support in Iqbal, that he has some affirmative responsibility for assuring that his subordinates and establishing policy that assure that his subordinates fulfill those obligations, Your Honor. Thank you. Thank you, Counsel. This has been thoroughly briefed and argued, and we'll take it under advisement.